Thomas J. Woodbury
FOREST DEFENSE, P.C.
618 Rollins St.
Missoula, MT 59801
(650) 238-8759
tom@wildlandsdefense.org

*Attorney for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## <u>MISSOULA DIVISION</u>

| | | |
|---|---|---|
| NATIVE ECOSYSTEMS | ) | |
| COUNCIL and MONTANA | ) | cv9:17-077-DLC |
| ECOSYSTEM DEFENSE | ) | |
| COUNCIL, | ) | PLAINTIFFS' AMENDED |
|     Plaintiffs, | ) | COMPLAINT FOR |
| v. | ) | DECLARATORY AND |
| LEANNE MARTEN, in her official | ) | INJUNCTIVE RELIEF |
| capacity as Regional Forester of | ) | |
| Region One U.S. Forest Service, | ) | |
| UNITED STATES FOREST | ) | |
| SERVICE, an agency of the | ) | |
| United States, and BILL AVEY, in his | ) | |
| official capacity as Supervisor of the | ) | |
| Helena-Lewis & Clark National Forest. | ) | |
|     Defendants. | ) | |

# I. INTRODUCTION

1. This is a civil action for judicial review under the Administrative Procedures Act of the U.S. Forest Service's March 2, 2017 Decision Memo approving the JOHNNY CROW WILDLIFE HABITAT IMPROVEMENT PROJECT ("Project") in portions of the Elkhorns Wildlife Management Unit ("Elkhorns") located within the Townsend and Helena Ranger Districts of the Helena-Lewis & Clark National Forest ("Helena").

2. Plaintiffs allege that the challenged decision is arbitrary and capricious, an abuse of discretion, and/or otherwise not in accordance with law.

3. The Project was categorically excluded from preparation of an Environmental Assessment or Impact Statement pursuant to an exclusion for wildlife improvement projects.

4. The Decision Memorandum for the Project violates the National Environmental Policy Act (NEPA), 42 U.S.C. 4331 *et seq.*, the National Forest Management Act (NFMA) 16 U.S.C. §1600 *et seq.*, and/or the Administrative Procedure Act (APA), 5 U.S.C. §§ 701 *et seq.*

5. Plaintiff seeks declaratory and injunctive relief to protect Plaintiffs' interests at law.

6. Plaintiff requests that approval of the Project be set aside pursuant to 5 U.S.C. §706(2) and (D), and that the Court enjoin the Forest Service from implementing this Project until Defendants comply fully with NEPA, NFMA, and APA.

7. Plaintiff seeks a declaratory judgment, injunctive relief, the award of costs of suit, including attorney and expert witness fees pursuant to the Equal Access to Justice Act, 28 U.S.C. § 2412, and such other relief as this Court deems just and proper.

## II. Jurisdiction

8. This action arises under the laws of the United States and involves the United States as a defendant. Therefore, this Court has subject matter jurisdiction over the claims specified in this Complaint pursuant to 28 U.S.C. §§ 1331, 1346.

9. An actual controversy exists between Plaintiffs and Defendants. Plaintiffs use and enjoys the Elkhorns for hiking, fishing, hunting, camping, photographing scenery and wildlife viewing, and engaging in other vocational, scientific, spiritual, and recreational activities. Plaintiffs' members intend to continue to use and enjoy the area on an ongoing basis in the future.

10. The aesthetic, recreational, scientific, spiritual, and educational interests of Plaintiffs have been and will be adversely affected and irreparably injured if Defendants implement the Project. These are actual, concrete injuries caused by Defendants' failure to comply with mandatory duties under NFMA, NEPA, and APA. The requested relief would redress these injuries and this Court has the authority to grant Plaintiffs' requested relief under 28 U.S.C. §§ 2201 & 2202, and 5 U.S.C. §§ 705 & 706.

11. Plaintiffs have fully participated in the administrative review process, and has exhausted administrative remedies. Thus the challenged decision is final and subject to this Court's review under the APA. 5 U.S.C. §§ 702, 704, and 706.

## III. Venue

12. Venue in this case is proper under 28 U.S.C. § 1391(e) and U.S. District of Montanan Local Rule 3.3(a)(1). Defendant Weldon, an officer of the U.S. Forest Service with its

Region One office in Missoula, resides within the Missoula Division of the United States District Court for the District of Montana, and is the principal representative in this District of Defendant U.S. Forest Service (Forest Service). The Regional Forester is principally responsible for ensuring that decisions in Region One conform with the laws protecting wildlife and the environment.

13. The challenged decision is representative of official policies and procedures common to Region One regarding prescribed fire to promote forage for livestock usage and promoting grasslands at the expense of ecotones and sagebrush habitat by eliminating so-called "encroaching" conifers.

14. This Court found venue proper in this District and Division in a challenge to at least one previous project in the Elkhorns. See, e.g.: *Native Ecosystems Council vs. USFS*, 418 F.3d 953 (C.A. 9 2005).

### IV. Parties

15. Plaintiff NATIVE ECOSYSTEM COUNCIL (NEC) is a non-profit Montana corporation with its principal place of business in Three Forks, Montana. NEC is dedicated to the conservation of natural resources on public lands in the Northern Rockies. Its members use and will continue to use the Elkhorns for work and for outdoor recreation of all kinds, including fishing, hunting, hiking, horseback riding, and cross-country skiing. The Forest Service's unlawful actions adversely affect NEC's organizational interests, as well as its members' use and enjoyment of the Elkhorns, including the Project area. NEC brings this action on its own behalf and on behalf of its adversely affected members.

16. Plaintiff MONTANA ECOSYSTEM DEFENSE COUNCIL (MEDC) is a non-profit grassroots organization headquartered in Kalispell, Montana. The Council was established in 1990 to protect and restore biological diversity, water quality and ecosystem integrity in the Northern Rockies region, which includes the Elkhorn Mountains Wildlife Management Unit and the Project area. MEDC brings this action on its own behalf and on behalf of its adversely affected members.

17. Defendant LEANNE MARTEN is the Regional Forester for the Northern Region of the U.S. Forest Service, and in that capacity is charged with ultimate responsibility for ensuring that decisions made at the National Forest (unit) level in the Northern Region are consistent with applicable laws, regulations, and official policies and procedures. Defendant Marten is the highest level representative for the U.S. Forest Service in the District of Montana.

18. Defendant UNITED STATES FOREST SERVICE is an administrative agency within the U.S. Department of Agriculture, entrusted with management of our National Forests, including the unique Elkhorn Wildlife Management Unit of the Helena-Lewis & Clark National Forest.

19. Defendant BILL AVEY is the Supervisor for the Helena-Lewis & Clark National Forest, responsible for ensuring that management of the Elkhorns is in compliance with all applicable laws and regulations.

## V. FACTUAL ALLEGATIONS

20. NEPA is our "basic national charter for protection of the environment," 40 C.F.R. §1500.1(a), and directs all federal agencies to assess the environmental impact of their

proposed actions that can significantly affect the quality of the environment. 42 U.S.C. § 4332(2)(C).

21. An Environmental Impact Statement (EIS) must be prepared under NEPA whenever a proposed action may cause a significant effect on some environmental factor. *Idaho Sporting Congress v. Thomas*, 137 F.3d 1146, at 1149-50 (9th Cir. 1998). "This is a low standard." *Klamath-Siskiyou Wildlands Ctr. v. Boody*, 468 F.3d 549, 562 (9th Cir. 2006).

22. Agencies can only bypass the normal EIS (or EA) process for "categories of actions which do not individually or cumulatively have a significant effect on the human environment." *Sierra Club v. Bosworth*, 510 F.3d 1016, 1019 (9th Cir. 2007); 40 C.F.R. §1508.4.

23. A "cumulative impact" "is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." 40 C.F.R. § 1508.7. "Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7).

24. The Forest Service may not use a categorical exclusion absent *certainty* that the project will not cause significant effects to the environment. 36 C.F.R. § 220.6(c).

25. Thus, an EA (or EIS) is required if there will be significant effects or uncertainty exists as to whether the cumulative effects of the proposed action will be significant. 36 C.F.R. § 220.6(c).

26. According to Forest Service Guidance: "CEQ regulations allow Federal agencies to

exclude from documentation in an environmental assessment (EA) or environmental

impact statement (EIS) categories of actions that do not individually or cumulatively

have a significant effect on the human environment." FSH 1909.15 Ch. 30.

27. The Elkhorns Project challenged here was categorically excluded from further NEPA

review pursuant to 36 CFR 220.6(e)(6) ("category 6"), which provides for: "Timber

stand and/or wildlife habitat improvement activities that do not include the use of

herbicides or do not require more than 1 mile of low standard road construction."

28. The Forest Service Handbook ("FSH") for Categorical Exclusions provides that: "If

the responsible official determines, based on scoping, that it is uncertain whether the

proposed action may have a significant effect on the environment, prepare an EA. If

the responsible official determines, based on scoping, that the proposed action may

have a significant environmental effect, prepare an EIS. (36 CFR 220.6(c))." FSH

1909.15 Ch. 30.

29. The FSH provides guidance for implementing the above-referenced scoping as

follows (FSH 1909.15 Ch. 30, at 31.3): "Scoping is required for all Forest Service

proposed actions, including those that would appear to be categorically excluded (sec.

11). Scoping is important to discover information that could point to the need for an

EA or EIS versus a CE. Scoping is the means to identify the presence or absence of

any extraordinary circumstances that would warrant further documentation in an EA

or EIS. Scoping should also reveal any past, present, or reasonably foreseeable future

actions with the potential to create uncertainty over the significance of cumulative

effects. Scoping complexity should be commensurate with project complexity."

30. When an agency decides to proceed under a categorical exclusion, it is required to adequately explain its decision, and ensure "extraordinary circumstances" do not exist in which a normally excluded action may have significant environmental effects. 40 C.F.R. § 1508.4.

31. "Accurate scientific analysis, expert agency comments, and public scrutiny are essential to implementing NEPA." 40 C.F.R. § 1500.l(b).

32. "When an agency decides to proceed with an action in the absence of an EA or EIS, the agency must adequately explain its decision." *Alaska Ctr.for Env't,* 189 F.3d at 859. In doing so, it "must supply a convincing statement of reasons why potential effects are insignificant." *Id.*

33. A categorically excluded project must still demonstrate consistency with relevant forest plan standards adopted pursuant to NFMA, including relevant standards implementing NFMA's mandate to provide for diversity of plant and animal species in the planning area. 16 U.S.C. 1604(g).

34. NFMA regulations require Forest Service planning decisions to be based upon the best available scientific information. 26 C.F.R. § 219.3.

35. Forest Service implements NFMA's substantive mandate to "provide for diversity of" wildlife on National Forests, 16 U.S.C. §1604(g)(3)(B), and the Department of Agriculture's Regulation 9500-4, with the following rules:

**2670.12 - U.S. Department of Agriculture Directives**

Departmental Regulation 9500-4. This regulation directs the Forest Service to:

1.  Manage "habitats for all existing native and desired nonnative plants, fish, and wildlife species in order to maintain at least viable populations of such species."

2.  Conduct activities and programs "to assist in the identification and recovery of threatened and endangered plant and animal species."

3.  Avoid actions "which may cause a species to become threatened or endangered."

**FSM 2670.22: Objectives for Sensitive Species:**

1.  Develop and implement management practices to ensure that species do not become threatened or endangered because of Forest Service actions.

2.  Maintain viable populations of all native and desired nonnative wildlife, fish, and plant species in habitats distributed throughout their geographic range on National Forest System lands.

3.  Develop and implement management objectives for populations and/or habitat of sensitive species.

36. The Elkhorn Wildlife Management Unit is unique in the National Forest System, and was established as a result of the Final Elkhorn Wilderness Study Report (1982).

37. The Helena Forest Plan ("Plan") establishes separate standards for the Elkhorn Wildlife Management Unit, in addition to the standards of general applicability set forth in the Plan. According to Plan, "Wildlife habitat will be managed" in the Elkhorns "to maintain viable populations of species associated with existing ecosystems…"

38. According to the Plan, the Montana Department of Fish, Wildlife and Parks ("MDFWP") and the Forest Service are to "jointly prepare an annual report that is based on and discusses the results of the Elkhorn Wildlife Monitoring Program" adopted by the agencies cooperatively in 1982. The objectives of that program,

according to the Forest Plan, were to: "(1) evaluate management direction provided in

Forest Plans; (2) provide recommendations to maintain and improve wildlife habitat;

and (3) continue to monitor habitat conditions and wildlife populations to determine

the effectiveness and applicability of existing and prescribed management."

39. The wildlife standard adopted in the Plan that is specific to the Elkhorns provides that

the Forest Service will: "Implement wildlife habitat improvement practices,

particularly prescribed fire, to maintain and enhance the quality of elk winter range.

Suggested habitat improvement projects will be discussed in the Elkhorn Wildlife

Monitoring Program annual progress reports, prepared jointly by the Helena and

Deerlodge National Forests and MDFWP." (Plan Std. E-1).

40. While then-existing livestock allotments were incorporated into the Elkhorns,

permitted livestock forage levels were to be maintained at pre-established levels

"unless deterioration (see glossary) of range condition occurs," with adjustments to be

made as needed "to ensure compatibility with elk winter range management

goals." (Plan Std. E-2).

41. Specific to the 44,900 acre Inventoried Roadless Area of the Elkhorns, in which a

portion of the challenged Project is to take place, the Plan provides that any

"[s]uggested habitat improvement projects will be provided [for] in the Elkhorn

Wildlife Monitoring Program annual progress reports prepared jointly by the Helena

and Deerlodge National Forests and MDFWP."

42. The last "Annual Report" issued pursuant to the Elkhorn Wildlife Monitoring

Program was for 1991 (DeSimone & Vore, *Elkhorn Elk Monitoring Program*, October

1992) (hereinafter, "EWMP 1991").

43. The EWMP 1991 describes its progress report as "preliminary recommendations for the management of elk habitat and hunting regulations[]," and then notes that "[e]fforts will be directed in the future to a more comprehensive analysis and preparation of recommendations based on this analysis."

44. EWMP 1991 reports that in the years leading up to its publication, the authors had "witnessed unprecedented levels of elk-related problems on private lands…" and then it goes on to note that "the Elkhorn herd may be one of the most vulnerable elk herds in the state" in part because of high road densities in winter range "and the mostly naturally-occurring lack of [hiding] cover." (pp. 1, 55).

45. After noting that the North and South Crow grazing allotments in the Elkhorns are "some of the largest allotments in the Northern Region" of the USFS, EWMP 1991 goes on to report that "the major effect of poor range conditions on elk may be the displacement from public lands in favor of private land." (pp. 55, 56).

46. In addition to the observed effects of livestock on elk habitat, as well as the naturally-occurring low levels of hiding cover in the Elkhorns, EWMP 1991 notes an existing contribution to poor hiding cover, and thus displacement of elk onto private lands, from an extensive 40,000 acre wildfire in 1988 and thousands of acres of timber harvest on private, BLM and DSL lands in the Elkhorns which had not regenerated sufficiently despite the passage of 2-3 decades. (pp. 56, 57).

47. In 1993, MDFWP, the Forest Service, and the BLM completed the "Elkhorns Landscape Analysis Documentation" ("ELAD") that included recommended "Desired

Conditions" emphasizing restoration of grasslands at the expense of reducing hiding cover that was naturally increasing as a result of encroachment by conifers and scrublands, including black sagebrush and big mountain sagebrush habitats. (e.g., in identifying conflicts that needed to be resolved in adopting Desired Conditions, "[i]ncreasing grasslands and decreasing conifer colonization will decrease over which may be functioning as hiding cover for big game." (ELAD, p. 118).

48. The ELAD recognized that the Elkhorns is a "premiere area" in Montana for mule deer, who prefer forbs and browse from shrubs and conifers (e.g., juniper) to grass, and who rely in part on shrubs as hiding cover, especially for fawns.

49. The Desired Conditions recommended in the ELAD are based on presumed natural ranges of variation for grasslands, shrubs, and conifers in the Elkhorns, rather than on Forest Plan direction (the forest plans "contain no description of specific desired vegetation conditions" for the Elkhorns, as ELAD acknowledges at p. 115). As such, the Forest Service recognized that it needed to amend the Helena Plan to incorporate the recommendations set forth in the ELAD (e.g., at p. 7: in developing desired conditions, "necessary amendments or changes to the Forest Plan are recommended. While these may be changes or additions to standards and guidelines, site specific amendments may also need consideration.")

50. According to the Ecosystem Research Group ("ERG") that was retained by the Forest Service to work on resolving conflicts between vegetation usage by livestock and wildlife in the Elkhorns, "[a]ll projects in the Elkhorn Mountains are based on [the] overall desired conditions" recommended in the ELAD (2001 slideshow presented to

the Elkhorn Working Group).

51. In 1996, the Forest Service attempted to amend the Helena Plan to incorporate recommendations from the ELAD pursuant to an Environmental Assessment; however, the Montana District Court (Missoula Division) ruled in April 1999 that such an amendment represented significant changes under both NFMA and NEPA, and thus the Forest Service was required to prepare an Environmental Impact Statement prior to adopting the Plan amendment(s).

52. The South Elkhorns Range and Vegetation Project proposed pursuant to an Environmental Assent completed in 1998 was withdrawn by the Forest Service subsequent to the District Court's invalidation of the Plan Amendment in the above-referenced litigation.

53. The Forest Service has yet to amend the Helena Plan to adopt the Desired Conditions and other recommendations set forth in the ELAD.

54. Around the time of the district court's invalidation of the Helena Plan amendment for the Elkhorns, a severe drought ensued which, according to ERG, "renewed debate on the allocation of forage between livestock and elk in the Elkhorn Mountains, and the impact of elk on adjacent private lands."

55. According to an article in the Prairie Star by Bill Brewster ("Elkhorn Working Group outlines new vegetative study," April 15, 2004), the Elkhorns "has almost as many uses as there are opinions on how it should be managed." According to a quote from David Brown, chairman of the Elkhorn Working Group, "In the past, there has been a lot of conflict because of those interested in elk populations and the use of the public

land for cattle," with hunting and wildlife organizations maintaining that "cattle grazing during the summer season on the public lands has reduced the rangeland resource that should be available for elk" in the Elkhorns, and complaints from recreational users "about cattle destroying vegetation and stream banks in riparian areas."

56. The challenged Project is once again an attempt by the Forest Service to implement the recommendations of the 1993 ELAD, including Desired Conditions that seek to expand grasslands at the expense of shrubs and conifers which are encroaching on those grasslands in the form of "ecotones" (transition zones between forest and grasslands).

57. While the purported purpose and need for the Project is to increase forage to benefit elk, in fact elk populations in the Elkhorns are well within MDFWP objectives, and have been so consistently since at least the early 2000s.

58. Cows would clearly benefit from increased forage and programs intended to increase grasslands at the expense of conifers.

59. In spite of the failure to amend the Helena Plan to adopt Desired Conditions recommended in the ELAD, the Forest Service has carried out many smaller projects over the years that involved "treatments" designed to produce a trend towards those Desired Conditions, including but not limited to prescribed burns at the expense of shrubs, including sagebrush, and conifers, including junipers.

60. If anything, displacement of elk onto private lands during hunting season has become an increasingly significant environmental impact across Montana since it was first

recognized in the Elkhorns. For example, according to MDFWP's comments on proposed reductions in elk security in the Helena NF proposed as part of their travel plan, the "lack of fall security [is] likely limiting both survival of bull elk and retention of elk on public lands during the fall hunting seasons… Hunter opportunity and MDFWPs management capabilities generally decrease as elk are displaced from public to private lands… Displacement of elk from public land to private land refuges is an increasing concern."

61. Ecotones created by so-called conifer encroachment onto grassland areas are recognized by the Forest Service itself as containing more wildlife diversity than either the grasslands or forests which define their edges, and the Elkhorns "are a landscape characterized by edges and ecotones." (Project Wildlife Report, p. 50).

62. According to the Project Wildlife Report, while "[m]aintaining hiding cover in the project area is important to maintain big game habitat capability and hunting opportunity," hiding cover "would be removed in security areas in the North and South Crow herd units" if the Project goes forward.

63. Increases in hiding cover and winter forage and thermal cover that results from encroachment of conifers onto grasslands in the Elkhorns is a wildlife benefit, not a detriment to wildlife.

64. While increasing grasslands could benefit some wildlife species, many sensitive and big game wildlife species that inhabit the Elkhorns benefit from increases in shrubs and conifers in the ecotones which the Forest Service characterizes as "encroachment," including but not limited to: moose, mule deer, sage thrasher,

Brewer's sparrow, ferruginous hawks, and antelope.

65. The Decision Memo for the Project represents to the public that, while the project calls for prescribed burns on 9,565 acres of shrubland/grassland habitat, no sagebrush stands will be burned.

66. According to supporting documentation for the Project, the Helena Plan standard for "sagebrush reduction programs" applies to the treatments.

67. According to supporting documentation for the Project, prescribed fire will not be applied in sagebrush stands "except where fire may incidentally extend into a sagebrush stand as a result of adjacent grassland burning or where individual, scattered sagebrush occurs in grassland treatments."

68. While acknowledging that prescribed burning treatments in the Elkhorns have continued under the Helena Plan, and in spite of the Plan's requirement to demonstrate effectiveness of such treatments, the Forest Service has failed to disclose and analyze the extent of prescribed burning across the Elkhorns, the effectiveness of such treatments, and/or the cumulative effects on wildlife species and their habitats from prescribed burns.

69. The Forest Service has failed to provide mapping of sagebrush stands/habitat and juniper/limber pine habitats in the Project area, or even to disclose acreage of such habitats, in spite of acknowledging the importance of these habitats to wildlife species and the obligation to manage the Elkhorns for existing ecosystems and for the benefit of wildlife species.

70. Limber pine trees have high value for wildlife due to the high fat content of their

large seeds.

71. The Forest Service has failed to disclose "desired outcomes" for the treatments approved in the Project, and/or to tier these to past monitoring of same from previous treatments analyzed in annual reports prepared with MDFWP, as required by the Helena Plan.

72. In spite of damage to riparian habitats associated with livestock, including but not limited to the failure for aspen to regenerate in the absence of fencing to prevent access by livestock, and the Forest Plan direction to reduce livestock uses when ecosystems are degraded by same, the Project does not consider reducing usage by, and excluding, livestock from riparian areas in the Project Area.

73. In the past, the Forest Service has removed livestock from a degraded ecosystem in the Elkhorns, and observed that the affected area rebounded to the benefit of the wildlife uses to which the Elkhorns are presumably dedicated, and for which the Project is purportedly needed.

74. While the Project includes prescribed burns in thousands of acres of lodgepole pine forests, and the Forest Service claims no old growth habitat will be treated, no maps are provided disclosing old growth inventories, nor is any other information included that would permit the public to determine impacts to old growth habitat and species.

75. According to the Project Decision Memo, due to concerns expressed about the importance of sagebrush for wildlife, "[p]rescribed fire will not be applied in sagebrush stands except where fire may incidentally extend into a sagebrush stand as a result of adjacent grassland burning." AR022564.

76. The Project seeks includes 6,046 acres of treatment in 37,052 acres of the 75,415

acre Elkhorns Inventoried Roadless Area ("IRA").

77. In order to achieve "desired vegetative conditions" the Project includes hand

slashing and prescribed burning across an estimated 9,565 acres of grasslands and

shrublands, as well as 3,000 acres of prescribed fire in forested habitats.

78. The effects of the Project on the wilderness characteristics of the IRA include 5,796

acres of hand-slashing conifers up to 12" dbh, creating stumps that will be evident

on the landscape for up to 20 years.

79. While the Forest Service maintained that it had evaluated the impacts of treatments

on all the relevant wilderness quality attributes, it failed to evaluate the impact on

the essential wilderness quality referred to as "untrammeled." According to USDA

Forest Service Gen. Tech. Rep. RMRS-GTR-340:

> Section 2(c) of the Wilderness Act defines wilderness as "an area
> where the earth and its community of life are untrammeled by man,"
> as an area that "generally appears to have been affected primarily by
> the forces of nature[,]" and as an area "retaining its primeval
> character and influence." The term "untrammeled" is defined in the
> American Heritage dictionary (2011) as "allowed to run free," and
> synonyms include unrestrained, unrestricted, unhindered,
> unimpeded, unencumbered, and self-willed. When testifying at the
> final Senate hearing for the proposed Wilderness Act, Zahniser
> (1963b, p. 68) stated that in the bill's definition of wilderness, "…the
> first sentence [on untrammeled] is definitive of the meaning of the
> concept of wilderness, its essence, its essential nature…The first
> sentence defines the character of wilderness." In this monitoring
> strategy, the Untrammeled Quality means that wilderness is
> essentially unhindered and free from the intentional actions of
> modern human control or manipulation.

80. The Forest Service analysis of impacts of the Project on the IRA referenced only the

portion of the IRA that is within the Project Area, rather than the entire roadless

expanse associated with the Elkhorns IRA.

81. There is no disclosure in the administrative record for the Project of the total acres

that have received similar treatments in the Elkhorns IRA; that is, the cumulative

acres of hand-slashing and prescribed burning within the 75,415 acre Elkhorns IRA.

## VI. CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF PURSUANT TO NEPA

1.  All above paragraphs are incorporated by reference.

2.  It was arbitrary, capricious, and otherwise not in accordance with law for Defendants

to determine that the Elkhorns Project could be categorically excluded from further

NEPA analysis, especially given the unique importance of the Elkhorns as indicated by

its special designation from Congress, which should have been considered an

extraordinary circumstance pursuant to 36 CFR 220.6(b)(1).

3.  The cumulative impacts of prescribed burns in the Elkhorns area generally, and the

Project Area in particular, represents an extraordinary circumstance that precludes

categorically excluding further salvage logging.

4.  The Project Decision is not based on a consideration of the best available scientific

information, and ignores any controversy over the scientific assumptions that it is

based upon.

### SECOND CLAIM FOR RELIEF PURSUANT TO NEPA

1.  All above paragraphs are incorporated by reference.

2.  There is scientific controversy over the effects of prescribed burning, and removal of conifer encroachment, on affected ecosystem resources.

3.  Uncertainty exists over the assumptions concerning fire return intervals and historic ranges of variability associated with existing ecosystems in the Elkhorns, and the Forest Service has chosen to rely on non-peer-reviewed science that is not supported by relevant peer-reviewed science in determining fire return intervals in the Elkhorns.

4.  There is no demonstrated need for increasing forage/grasslands to benefit big game and other wildlife in the Elkhorns, as elk herd numbers are stable and within targeted population goals of MDFWP, and as wildlife benefits more from conifer and ecotone habitats than it does from grasslands; thus, the purpose and need for the Project is not supported by the factual record.

5.  The Defendants failed to take a hard look at the potential impacts of prescribed burning and conifer removal on affected wildlife species viability, including but not limited to sensitive species.

6.  The Defendants failed to take a hard look at the cumulative impacts of conifer removal and reductions in hiding cover and security on big game and the displacement of elk from public to private lands, which is a significant state-wide environmental problem in Montana associated in part with inadequate elk security, and has been documented in the Elkhorns as well.

7.  Given the scientific controversy over elk displacement and the effects of prescribed burning, together with the uncertainty over fire return intervals, the Forest Service must prepare an Environmental Assessment pursuant to NEPA in order to determine whether or not an EIS is required for the proposed treatments.

## THIRD CLAIM FOR RELIEF PURSUANT TO NEPA & NFMA

1.  All above paragraphs are incorporated by reference.

2.  Defendants are attempting to implement recommendations, such as Desired Conditions, from non-NEPA documents, including but not limited to Landscape Assessments, that have never been properly incorporated into the Helena Forest Plan.

3.  Defendants have been instructed by the courts to prepare an Environmental Impact Statement to amend the Helena Plan prior to adopting the recommendations from the non-NEPA, non-Forest Plan Landscape Assessments.

4.  The Decision Memorandum fails to demonstrate compliance with several of the Helena Forest Plan's standards applicable to the Elkhorns, including but not limited to the requirement to base treatments on analysis set forth in annual Elkhorn Wildlife Monitoring Program progress reports prepared jointly by MFWP and the Forest Service.

5.  Based upon applicable and relevant holding from the District Court of Montana, the Defendants are required to amend the Helena Forest Plan and/or prepare an Environmental Impact Statement prior to approval and implementation of the challenged Project.

## FOURTH CLAIM FOR RELIEF PURSUANT TO NEPA & NFMA

1.  All above paragraphs are incorporated by reference.

2.  The Circuit Court has Smith held that there are at least two separate reasons why logging in roadless areas is environmentally significant, so that environmental consequences must be considered in an EIS. 33 F.3d at 1078-79. First, roadless areas

have certain attributes that must be analyzed. Those attributes, such as wildlife habitat and recreation opportunities, possess independent environmental significance. Second, roadless areas are significant because of their potential for designation as wilderness areas under the Wilderness Act of 1964, 16 U.S.C. §§ 1131-1136. *Lands Council v. Martin*, 479 F.3d 636, at 640 (9th Cir. 2007); *Smith v. USFS,* 33 F.3d 1072, at 1078-79 (9th Cir. 1994).

3.  The cumulative effects of continued livestock use, together with slashing and burning conifer and shrubland habitat types (that is, ecosystem management), on the wilderness characteristics, together with the potential for future consideration as wilderness, of the roadless portion of the Elkhorns has never been considered or disclosed in an environmental impact statement.

4.  The Project as approved includes more than nine square miles of logging conifers with chainsaws for all trees with trunks up to 12 inches diameter measured at breast height; however, there is no disclosure of the amount of the previous fuels activities carried out pursuant to ecosystem management to achieve desired conditions that may have created similar stump fields in the Elkhorns Inventoried Roadless Area.

5.  The Project was approved without adequate consideration of the potential environmental impacts on the entire roadless expanse associated with the Elkhorns Inventoried Roadless Area.

## VII. REQUEST FOR RELIEF

For all of the above-stated reasons, Plaintiffs respectfully request that this Court:

A. Declare that the Project violates the law;

B. Enjoin implementation of the Project;

C. Award Plaintiffs their costs, expenses, expert witness fees, and reasonable attorney

   fees under the Equal Access to Justice Act; and

D. Grant Plaintiffs any such further relief as may be just, proper, and equitable.


Respectfully submitted this 18th day of December, 2017.

/s/ Thomas J. Woodbury
Thomas J. Woodbury
Attorney for Plaintiffs