IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

**FILED**

DEC 10 2018

Clerk, U.S. Courts
District Of Montana
Missoula Division

| | |
|---|---|
| NATIVE ECOSYSTEMS COUNCIL and MONTANA ECOSYSTEM DEFENSE COUNSIL, | CV 17–77–M–DLC |
| Plaintiffs, | ORDER |
| vs. | |
| LEANNE MARTEN, Regional Forester of Region One of the U.S. Forest Service, and BILL AVEY, Supervisor of the Helena-Lewis and Clark National Forest, | |
| Defendants. | |

Before the Court are Plaintiffs' Motion for Summary Judgment (Doc. 10),

Motion to Supplement the Record (Doc. 13), and Motion for Leave to File

Amended Complaint (Doc. 19), as well as Defendants' Motion to Strike

Declarations of Sara Jane Johnson and Jeff Juel (Doc. 17) and Cross-Motion for

Summary Judgment (Doc. 22). As regards summary judgment, the Court will

grant Defendants' Motion and deny Plaintiffs' Motion. Additionally, the Court

will grant Plaintiffs' Motion to Amend the Complaint and Motion to Supplement

but will deny Defendants' Motion to Strike.

-1-

## BACKGROUND

Plaintiffs challenge the Defendants' approval of the Johnny Crow Wildlife Habitat Improvement Project ("the Johnny Crow Project" or "the Project") under the National Environmental Protection Act and the National Forest Management Act. Plaintiffs seek declaratory and injunctive relief. The Johnny Crow Project is a non-commercial habitat enhancement project in the Elkhorn Wildlife Management Unit ("Elkhorn WMU") of the Helena-Lewis and Clark National Forest ("HNF" or "the Forest").

## I. National Forest Management Act

Defendant, the United States Forest Service ("Forest Service"), manages the National Forests pursuant to the duties and obligations established in part by the National Forest Management Act of 1976 ("NFMA"). *See* 16 U.S.C. §§ 1600–1614. The NFMA and its implementing regulations provide for forest planning at two levels: the forest level and the individual project level. *See id.* At the forest level, the Forest Service develops a Land and Resource Management Plan (also known as a "forest plan"), which is a broad, long-term planning document ensuring consideration of both economic and environmental factors for a National Forest— the administrative unit of the National Forest System. A forest plan establishes planning goals and objectives for management of the forest resources within a specific National Forest. 16 U.S.C. § 1604(g)(1)–(3). The Forest Service

-2-

implements a forest plan through individual projects—site-specific actions such as resource management plans—that must be consistent with the governing forest plan. 16 U.S.C. § 1604(i).

The governing forest plan in this case is the Helena National Forest Plan ("HNFP" or "the Forest Plan") established in 1986 for the management of the Helena-Lewis and Clark National Forest. More specifically, this case arises within the Elkhorn Wildlife Management Unit incorporated into the HNFP.

## II. National Environmental Policy Act

The National Environmental Policy Act ("NEPA") requires the Forest Service to take a "hard look" at the potential environmental consequences of proposed actions before making a final decision to proceed. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). NEPA itself "does not mandate particular results, but simply prescribes the necessary process." *Id.* In essence, "NEPA merely prohibits uninformed—rather than unwise—agency action." *Id.* at 351.

NEPA's "necessary process" requires the Forest Service to prepare a detailed environmental impact statement ("EIS") for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Consequently, a "threshold question in a NEPA case is whether a proposed project will 'significantly affect' the environment, thereby triggering the

requirement for an EIS." *Blue Mountains Biodiversity Project v. Blackwood*, 161
F.3d 1208, 1212 (9th Cir. 1998) (quoting 42 U.S.C. § 4332(C)). As a preliminary
step, the Forest Service may prepare an environmental assessment ("EA") to
determine whether the environmental impact of the proposed action is "significant
enough to warrant preparation of an EIS." *Id.* (citing 40 C.F.R. § 1508.9). An EIS
is a "detailed statement" on, among other things, the "environmental impact of [a]
proposed action" and "alternatives to the proposed action," 42 U.S.C. § 4332(C),
while an EA is a "concise public document" which serves to "provide sufficient
evidence and analysis for determining whether to prepare an [EIS] or a finding of
no significant impact," 40 C.F.R. § 1508.9(a).

However, in limited cases, neither an EA nor an EIS is required. A federal
agency need do neither if the agency determines that the proposed action falls
within an established categorical exclusion. 36 C.F.R. § 220.6(a); 40 C.F.R.
§ 1508.4. Categorically excluded actions are those actions "which do not
individually or cumulatively have a significant effect on the human environment
and which have been found to have no such effect in procedures," *id.*, which have
been adopted by any agency of the Federal Government which is implementing the
mandatory "procedural provisions of the National Environmental Policy Act," 40
C.F.R. § 1500.3. Nonetheless, prior to an agency's use of a categorical exclusion,
it must make allowances for "extraordinary circumstances in which the normally

-4-

excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4.

Thus, an action may be categorically excluded only if it falls within certain

enumerated categories and "there are no extraordinary circumstances related to the

proposed action." 36 C.F.R. § 220.6(a). Otherwise, the agency is required to

prepare either an EA or EIS.

Here, the Forest Service applied a categorical exclusion to the Johnny Crow

Project in its effort to comply with the demands of NEPA.

## III.    The Elkhorn Wildlife Management Unit

The Elkhorn Mountains are located approximately 16 miles southeast of

Helena, Montana. They are unique in the National Forest System because Forest

Service ownership extends "over most of the foothills down to the surrounding

valley floors," a large proportion of elk winter range exists on that Forest Service

land, and there is a "diversity of habitat and lack of development." AR 1614.

Consequently, the Elkhorns were once considered for "inclusion in the Wilderness

Preservation System." AR 1615. Ultimately, however, the Elkhorns were instead

recommended to become a wildlife management unit after completion of the Final

Elkhorn Wilderness Study Report and accompanying Final Environmental Impact

Statement ("FEIS"). AR 1615–1619. The Elkhorns became the first and only

wildlife management unit in the National Forest System. AR 4042. One of the

criteria for the establishment of the Elkhorn WMU in the HNFP was that

"[w]ildlife habitat will be managed to maintain viable population of species associated with existing ecosystems, with an emphasis on selected species that have seclusion as one of their habitat requirements." AR 24383; AR 25840. Additionally, land management activity for "other resource values will be considered when they are compatible with management direction for wildlife." AR 25840.

Because of the "almost total public ownership," the Elkhorns allow "near complete management of the mountain range." AR 1614. The management direction of the HNFP "emphasizes maintenance and enhancement" of habitat for both big game and non-game species. AR 16–17; AR 22561. Although the HNFP established this management direction for the entire forest, it also divides the National Forest land within the Helena National Forest into twenty-three separate "management areas" which are each subject to additional and individualized "management goals, resource potentials, and limitations." AR 24549. The management of the Elkhorns is undertaken in partnership as the Elkhorn Cooperative Management Area by the Bureau of Land Management, Butte Field Office, the Montana Department of Fish, Wildlife and Parks, the Natural Resource Conservation Service, the Army National Guard, and the United States Forest Service. AR 3763; AR 22563. These groups formalized a cooperative management strategy in a 1999 Memorandum of Understanding which provides

-6-

that "[e]cosystem [m]anagement is the umbrella concept in management of the Elkhorns" and "[w]ildlife values . . . are the major emphasis item on National Forest Lands." AR 4029. The Johnny Crow Project is the product of years of this collaboration.

The Johnny Crow Project is intended to "maintain and enhance desired vegetative conditions that provide habitat for a variety of wildlife species." AR 22561. Specifically, the project intends to "improve forage on elk and mule deer winter and summer range," "enhance nesting habitat for bird species that rely on grass and shrubland habitats," "increase riparian vegetation diversity for moose, mule deer, and westslope cutthroat trout," "promote age class and tree species diversity within conifer stands in order to improve elk calving and summer habitat;" and "encourage growth and expansion of whitebark pine." AR 22561–62. To achieve these ends, the Project proposes hand slashing followed by "broadcast prescribed fire where applicable" on an estimated 9,565 acres of grassland and shrublands; hand slashing possibly combined with "low-severity prescribed fire through indirect ignition" on an estimated 460 acres of riparian, wetland, and aspen habitat; "[m]ixed severity prescribed fire" on an estimated 3,000 acres of forested areas; and "hand slashing and/or girdling" on an estimated 500 acres of Five-Needle Pine habitat. AR 22565. The objective of most of these treatments is to "improve foraging habitat" for several wildlife species, including elk and mule

-7-

deer. AR 22563. Additionally, the estimated amount of treated acres is expected to be less than listed and will be determined based upon site conditions and "what will best meet the purpose and need." AR 22565.

Treatment activities are proposed to occur within four of the management areas designated by the HNFP within the Elkhorn WMU. AR 22566. Those include Elkhorn-1, Elkhorn-2, Elkhorn-3, and the Elkhorn Inventoried Roadless Area. AR 22566. Within Elkhorn-1, the Forest Service is obligated to "[i]mplement wildlife habitat improvement practices, particularly prescribed fire, to maintain and enhance the quality of elk winter range." AR 726; AR 24630. Within Elkhorn-2, the Forest Service is to "[i]mplement wildlife improvement practices to maintain and enhance mountain goat and summer elk habitat." AR 728; AR 24633. Within Elkhorn-3, the Forest Service is required to "[i]mplement wildlife habitat improvement practices, including prescribed fire and timber management, to maintain and enhance the quality of elk calving and summer habitat." AR 729; AR 24635. Suggested habitat improvement projects within these three management areas are to be "provided in the Elkhorn Wildlife Monitoring Program annual progress reports." AR 726; AR 728–29; AR 24639; AR 24633; AR 24635. Across the Helena National Forest, inventoried roadless areas, including the Elkhorn Inventoried Roadless Area involved here, are managed for "semi-primitive recreation and wildlife values." AR 24515.

-8-

It appears that the overriding methodology for achieving the Johnny Crow Project's goals is to remove "colonizing conifers" in the areas intended to be treated. AR 22561–62. The Project does not authorize cutting down trees or prescribed fire ignitions "in forested inclusions (islands of mature timber within a grass or shrubland)." AR 4521. Indeed, the Project ensures that prescribed "fire ignitions would be designed to avoid forested inclusions and limber pine stands to the extent feasible" and, in relation to riparian or wetland habitats, no direct ignition will occur—instead, fire will passively "be allowed to creep into the habitat." AR 4521–22. The project does not authorize the removal of commercial products and will not include new road construction, reconstruction, or maintenance. In fact, no large mechanized equipment will be involved and "access will remain unchanged." AR 22563. Nor will herbicides be applied. AR 22565. In short, the treatments proposed by the Johnny Crow Project are minimalist in both impact and scope.

Owing to the low-impact nature of the Project, it was approved under 36 C.F.R. § 220.6, which provides for the categorical exclusion of certain treatment activities from the Forest Service's typical obligation to prepare an EA or EIS. 36 C.F.R. § 220.6(e)(6) enumerates a category of activity to be excluded which includes:

-9-

(6) Timber stand and/or wildlife habitat improvement activities that do not include the use of herbicides or do not require more than 1 mile of low standard road construction. Examples include, but are not limited to:

(i) Girdling tree to create snags;

(ii) Thinning or brush control to improve growth or to reduce fire hazard including the opening of an existing road to a dense timber stand;

(iii) Prescribed burning to control understory hardwoods in stands of southern pine; and

(iv) Prescribed burning to reduce natural fuel build-up and improve plant vigor.

This category was deemed applicable "because the evidence presented in the project record . . . demonstrate[s] that the cause-effect relationship between the actions in [the Johnny Crow Project Decision Memorandum] and the degree of the effects on the resource conditions result in no extraordinary circumstances." AR 22566.

Because the Forest Service determined that the Johnny Crow Project falls within the wildlife habitat improvement category provided at 36 C.F.R. § 220.6(e)(6) and that there are no extraordinary circumstances precluding use of that exempted category of activities, the project was exempted from the requirement to complete an EA or EIS and was approved in a March 2, 2017 Decision Memorandum. AR 22564; AR 22571. Plaintiffs initiated this suit on June 6, 2017.

**LEGAL STANDARDS**

## I.    Summary Judgment

A party is entitled to summary judgment if it can demonstrate that "there is

no genuine dispute as to any material fact and the movant is entitled to judgment as

a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is warranted where

the documentary evidence produced by the parties permits only one conclusion.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986). Only disputes over

facts that might affect the outcome of the lawsuit will preclude entry of summary

judgment; factual disputes that are irrelevant or unnecessary to the outcome are not

considered. *Id.* at 248.

## II.    Administrative Procedures Act

Judicial review of agency decision under NFMA and NEPA are governed by

the Administrative Procedures Act ("APA"). *Neighbors of Cuddy Mountain v.*

*Alexander*, 303 F.3d 1059, 1065 (9th Cir. 2002). Under the APA "[a] person

suffering a legal wrong because of agency action, or adversely affected or

aggrieved by agency action within the meaning of a particular statute, is entitled to

judicial review thereof." 5 U.S.C. § 702. An agency action may be set aside under

the APA only if it was "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with the law." 5 U.S.C. § 706(2)(A). "The standard is

-11-

deferential." *River Runners for Wilderness v. Martin*, 593 F.3d 1064, 1070 (9th Cir. 2010.)

The arbitrary and capricious standard applies to this Court's analysis of Plaintiffs' NFMA claims. *Forest Guardians v. U.S. Forest Service*, 329 F.3d 1089, 1096–97 (9th Cir. 2003) ("Agency actions challenged under the NFMA . . . may be set aside only if they are arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law.") Accordingly, the Court must determine whether the agency's decision was "based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* at 1097. Particular to a NFMA case, when the Court is called upon to interpret the requirements of the Forest Service's own Forest Plan, the Forest Service "is entitled to substantial deference to its interpretation of its own regulations." *Id.* "Judicial review of an agency's interpretation of its own regulations is limited to ensuring that the agency's interpretation is not plainly erroneous or inconsistent with the regulation." *Id.*; *Klamath Siskiyou Wildlands Center v. Grantham*, 642 Fed. Appx. 742, 744 (9th Cir. 1016).

The arbitrary and capricious standard again applies, as is the case with Plaintiffs' NEPA claims, "to an agency's determination that a particular action falls within one of its categorical exclusions." *Bicycle Trails Council of Marin v. Babbitt*, 82 F.3d 1445, 1456 (9th Cir. 1996). When the Forest Service decides to

-12-

proceed with an action in the absence of an EA or EIS, it "must adequately explain its decision." *Alaska Center for Environment v. U.S. Forest Service*, 189 F.3d 851, 859 (9th Cir. 1999). To determine whether the Forest Service's action is arbitrary or capricious, this Court "must consider whether the decision was based on a consideration of the relevant factors and whether there has been clear error of judgment." *Id.* (internal quotation marks and citation omitted). "Once the agency considers the proper factors and makes a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Id.*

## DISCUSSION

Before wading into a discussion of the merits of the Parties' cross-motions for summary judgment, the Court finds it beneficial to dispense with three preliminary issues: 1) Plaintiffs' Motion to Supplement the Administrative Record (Doc. 13) and Defendants' responding Motion to Strike (Doc. 17); 2) Plaintiffs' Motion to Amend the Complaint (Doc. 19); and 3) the applicability of this Court's prior decision in *American Wildlands & Native Ecosystems Council v. U. S. Forest Service*, No. CV 99–160–M–DWM, Doc. 40; 1999 U.S. Dist. LEXIS 22243 (D. Mont. Apr. 14, 1999).

I.    **Plaintiffs' Motion to Supplement the Administrative Record and Defendants' Motion to Strike**

Contemporaneously with the filing of their summary judgment motion,

Plaintiffs' filed a Motion to Supplement the Administrative Record with the

declarations of Sara Jane Johnson, Ph.D. ("Dr. Johnson"), and Jeff Juel ("Juel").

(Doc. 13 at 1.) Dr. Johnson is the director of Plaintiff Native Ecosystems Council

and spent 14 years working as a wildlife biologist for the Forest Service. (Doc. 13-

1 at 2.) Juel's declaration reviews the analysis of the Project on the Elkhorns

Inventoried Roadless Area. (Doc. 13-2.) Defendants' thereafter filed a Motion to

Strike the Declarations of Dr. Johnson and Juel (Doc. 17). Defendants argue that

Plaintiffs have failed to carry their burden of proving that extra-record evidence is

necessary in this case. This Court disagrees.

In general, judicial review of agency action under the APA must be limited to

the administrative record. *San Luis & Delta-Mendota Water Auth. v. Locke*, 776

F.3d 971, 992 (9th Cir. 2014). This rule is designed to ensure that the reviewing

court gives the agency action appropriate deference. *Id.* The APA "gives an

agency substantial discretion 'to rely on the reasonable opinions of its own

qualified experts even if, as an original matter, a court might find contrary views

more persuasive.'" *Id.* (quoting *Marsh v. Oregon Natural Resources Council*, 490

U.S. 360, 378 (1989)). Consideration of extra-record evidence "to determine the

correctness of or wisdom of the agency's decision is not permitted" and, in

particular, expert testimony should not be admitted "for the purpose of determining

the scientific merit of the [agency's] decision." *Asarco, Inc. v. U.S. EPA*, 616 F.2d

1153, 1160–61 (9th Cir. 1980); *Locke*, 776 F.3d at 993.

There are four narrow exceptions to this general prohibition on the

consideration of extra-record evidence by a district court:

> (1) if admission is necessary to determine "whether the agency has
> considered all relevant factors and has explained its decision," (2) if
> "the agency has relied on documents not in the record," (3) "when
> supplementing the record is necessary to explain technical terms or
> complex subject matter," or (4) "when plaintiffs make a showing of
> agency bad faith."

*Northwest Environmental Advocates v. National Marine Fisheries Service*, 460

F.3d 1125, 1145 (9th Cir. 2006) (quoting *Lands Council v. Powell*, 395 F.3d 1019,

1030 (9th Cir. 2005)). These four "limited exceptions operate to identify and plug

holes in the administrative record" and are to be "narrowly construed and applied."

*Lands Council*, 395 F.3d at 1030. The party seeking admission of extra-record

evidence bears the burden of showing that a relevant exception applies. *Locke*, 776

F.3d at 993. Consequently, to support admission of proffered extra-record

evidence, Plaintiffs must first show that the record is inadequate. *See Lands

Council*, 395 F.3d at 1030.; *see also Fence Creek Cattle Co. v. U.S. Forest Service*,

602 F.3d 1125, 1131 (9th Cir. 2010) (faulting plaintiff for failing to "show any

such gaps or holes" to support supplementation).

Here, Plaintiffs assert that the challenged declarations are necessary to determine "whether the Forest Service has considered all relevant factors and adequately explained its decisions." (Doc. 26 at 3–4.) Plaintiffs have rehashed significant portions of their summary judgment briefs to support supplementation under this exception. (*Id.* at 2–8.) Namely, Plaintiffs assert that supplementation is necessary to determine whether or not Defendants considered the cumulative impacts of burning and logging when deciding that the actions proposed in the Project did not cumulatively have a significant effect on the human environment for purposes applying the categorical exclusion. (*Id.* at 6–7.) Consequently, the Court cannot determine whether or not the administrative record is deficient or whether or not the Forest Service considered all relevant factors without analyzing the merits of Plaintiffs claims. *Asarco, Inc.*, 616 F.2d at 1160 ("[I]t will often be impossible, especially when highly technical matters are involved, for the court to determine whether the agency took into consideration all relevant factors unless it looks outside the record to determine what matters the agency should have considered but did not."). Therefore, the Court finds that the challenged declarations are necessary to the determination of Plaintiffs merits arguments and will be admitted.

It is worth noting that the Court is wary of the impermissible purposes for which the declarations, and Dr. Johnson's declaration in particular, may be used.

Accordingly, the declarations will only be used for background information or "for the limited purposes of ascertaining whether the agency considered all the relevant factors or fully explicated its course of conduct or grounds of decision." *Id.* The Court will not consider the declarations "to determine the correctness or wisdom of the agency's decision." *Id.*

In light of the above, Defendants' Motion to Strike will be denied and Plaintiffs' Motion to Supplement will be granted. The Court will consider the declarations as outlined above.

## II. Plaintiffs' Motion to Amend the Complaint

Approximately one month after filing their summary judgment motion, Plaintiffs filed a Motion for Leave to File an Amended Complaint which indicated that Plaintiffs had "raised issues surrounding the effects of the Project on the Elkhorns Inventoried Roadless Area with greater specificity after having the opportunity to review the administrative record in this case." (Doc. 19 at 1–2.) In light of the fact that Plaintiffs' Motion had been filed a mere two days prior to the deadline for Defendants' cross-motion for summary judgment, Defendants responded that they did not oppose Plaintiffs' Motion as long as their right to respond to the amended allegations was preserved. (Doc. 21 at 2.) Unfortunately, this agreement between the Parties was overlooked and the Court did not grant the Plaintiffs' Motion prior to the conclusion of summary judgment briefing.

-17-

Nonetheless, during the June 13, 2018 Motions Hearing, Defendants' indicated that they would not require supplemental briefing on the issues raised in the amended complaint nor be prejudiced by its filing. Consequently, the Court will grant Plaintiffs' Motion and will move on to an analysis of Plaintiffs' arguments with the understanding that the amended complaint controls.[1]

## III. *American Wildlands v. United States Forest Service*

Plaintiffs contend that this Court's 1999 decision in *American Wildlands v. United States Forest Service* precludes Defendants from implementing the Johnny Crow Project because the Project applies principles of ecosystem management to the Elkhorn WMU in a way that results in a significant change to the management direction of this unique forest unit. The Court is not convinced.

In 1999 this Court held that the Forest Service's decision to implement a Forest Plan Amendment to both the HNFP and the Deerlodge National Forest Plan had violated both NFMA and NEPA because it the Forest Service had not completed an EIS on the Amendment. *American Wildlands*, 1999 U.S. Dist. LEXIS 22243, at *22–23. The Forest Plan Amendment would have changed the management direction for the entire 160,000-acre Elkhorn WMU. At roughly the same time, the

---

[1] Additionally, the Court finds that, as a preliminary matter, all arguments have been properly presented in this case unless otherwise noted.

Forest Service also approved the North Elkhorns Vegetative Treatment Project ("NEVT Project") under the Amendment to the Forest Plans.

American Wildlands, joined by Plaintiff Native Ecosystems Council, challenged both the Forest Plan Amendment and the NEVT Project under NFMA and NEPA. United States District Court Judge Donald W. Molloy found that the change proposed by the Amendment was "significant" within the meaning of NFMA and, accordingly, the Forest Service had not followed the appropriate procedures for its approval by analyzing the effects of those changes in an EIS. Judge Molloy also found that the significant changes proposed by the Amendment also required an EIS under NEPA. Because the NEVT Project was based upon the violative Forest Plan Amendment, Judge Molloy concluded that the Forest Service would need to reconsider the NEVT Project after an EIS had been prepared for the Amendment.

A year later, Judge Molloy responded to a motion for clarification by ordering that the Forest Service was not precluded by his prior order from "pursuing any projects or other on-the-ground activities in the Deerlodge and Helena National Forests, including the [NEVT Project or its components] that are consistent with the pre-amendment Forest Plans," NEPA, and NFMA. Additionally, Judge Molloy clarified that the Forest Service was not obligated to complete an EIS on the Forest

Plan Amendment if the Forest Service chose to forego the Amendment and continue operating under the existing plans. (Doc. 23-1 at 1–2.)

Plaintiffs in this case allege that the Johnny Crow Project takes up the cross from the unsuccessful Forest Plan Amendment because it proposes an "aggressive habitat manipulation program" which, like the foregone Amendment, would increase grasslands, reduce conifer forests, and reduce dense shrublands. Plaintiffs assert that the Project is one in a series of projects which demonstrate that the Forest Service has surreptitiously continued to implement ecosystem management counter to the directive of this Court's ruling in *American Wildlands*. Further, Plaintiffs claim that *American Wildlands* established that the Forest Service needed to comply with the "full NEPA process" before adopting ecosystem management.

Plaintiffs' place an inordinate amount of emphasis on the fact that the violative Forest Plan Amendment included concepts of ecosystem management in the Elkhorns.[2] It is true that Judge Molloy noted that the changes proposed by the Forest Plan Amendment were "driven" by the Forest Service's ecosystem

---

[2] The Court notes that Plaintiffs' assertion that the Ninth Circuit has "acknowledged" that implementation of ecosystem management would require an EIS is a misreading of the cited authority. (Doc. 30 at 21–22.) The Ninth Circuit merely summarized this Court's holding as relating to a challenge involving ecosystem management and a change in management direction. *Native Ecosystems Council v. U.S. Forest Service*, 418 F.3d 953, 958 (9th Cir. 2005). The Ninth Circuit did not make any statement which could be interpreted as "acknowledg[ing]" that implementation of ecosystem management in the Elkhorns would require the Forest Service to undertake an EIS.

-20-

management approach when holding that the changes were "significant" for purposes of NFMA. *American Wildlands*, 1999 U.S. Dist. LEXIS 22243, at * 19. However, the fact that ecosystem management was evoked in the Forest Plan Amendment was not the deciding factor in this Court's determination that the Amendment was in violation of NEPA or NFMA.

Judge Molloy found three aspects of the Amendment which established that it was "significant" enough to trigger further analysis before implementation. First, the Amendment would affect the "entirety" of the "discrete mountain range that is managed as a specialized unit emphasizing wildlife prevention"—the Elkhorn WMU. *Id.* at 17–18. Second, the Amendment changed the "goals, objectives and outputs" for the Elkhorns such that "mining, timber, and grazing" would be on par with wildlife conservation in the one-of-a-kind Wildlife Management Unit. *Id.* at 18 (internal quotation marks and citation omitted). Indeed, the Amendment contemplated that these activities, which are entirely inconsistent with the management direction for the Elkhorn WMU, would "occur so long as they are mitigated such that they do not appear dominant." *Id.* (internal quotation marks and citation omitted). Finally, the Forest Service had neglected considering the "unique character" of the Elkhorn WMU—a "recognition that wildlife is a prime resource in the Elkhorns" and wildlife maintenance a "prime goal" of the Elkhorn WMU. In contrast, the Amendment showed a "shift away

from a focus on wildlife to a multi-use approach allowing for the expansion of oil and gas leasing, motorized and non-motorized recreational opportunities, and achieving desired conditions for soil, water and vegetation throughout the mountain range." *Id.* at 18–19 (internal quotation marks omitted).

Notably, it was not the fact that the Forest Plan Amendment included concepts of ecosystem management that was fatal to the Amendment, it was the fact that the proposed changes resulted in a significant redirection of the forest management that was its downfall. This is further evidenced by Judge Molloy's later order clarifying that the effect of the earlier decision did not preclude the Forest Service from implementing parts of the NEVT Project so long as those parts were consistent with the pre-amendment forest plans, NEPA, and NFMA. In short, ecosystem management is not itself a black mark on a proposed project that automatically triggers the preparation of the EIS found necessary in *American Wildlands*. Only if the Forest Service decided to proceed with the significant management redirection proposed by the Forest Plan Amendment would it be required to prepare the EIS. (Doc. 23-1 at 2.)

Individual projects are still analyzed for compliance with the forest plan, NEPA, and NFMA. Here, despite Plaintiffs' efforts to portray the goals of the Johnny Crow Project as subversive and its proposed treatments as "aggressive," this localized project does not come close to attempting the kind of significant

-22-

redirection of the Elkhorn WMU management direction that was pivotal to this Court's decision in *American Wildlands*. The Johnny Crow Project proposes treatments that coincide with ecosystem management principles but are also minimal enough to fall within a categorical exclusion. The Project proposes to implement these treatments on less than 13,525 acres in the Elkhorns WMU. AR 22565. More importantly, the proposed treatments are intended to improve habitat for wildlife, which is consistent with the management direction of the Elkhorns. AR 22563. Consequently, the Johnny Crow Project will be analyzed in the same manner as any other individual forest project, not as some reincarnation of the Forest Plan Amendment at issue in *American Wildlands*.

## IV. Parties' Cross-Motions for Summary Judgment

### A. Plaintiffs' NFMA Claims

The Court proceeds to analyze Plaintiffs' NFMA claims with the following guiding principles at the forefront: 1) the Court is limited to determining whether the Forest Service based its decision on the relevant factors and whether there has been a clear error of judgment; and 2) the Court's review of the Forest Service's interpretation of its own Forest Plan is limited to ensuring that its interpretation is not plainly erroneous or inconsistent with the Forest Plan. *Forest Guardians*, 329 F.3d at 1097.

### i. Management direction to favor species requiring seclusion

Plaintiffs first contend that ecosystem management conflicts with the Forest Plan to such a significant extent that an EIS is necessary before the Forest Service can implement facets of ecosystem management. (Doc. 12 at 14–15.) Plaintiffs' arguments on this point are unavailing. As discussed in the Court's analysis of *American Wildlands*, the Court does not find that implementation of ecosystem management alone is sufficient to trigger the requirements imposed in that case. What we are dealing with here is one project, not a proposal to significantly change the management direction of the Elkhorns, Plaintiffs' arguments to the contrary notwithstanding. Consequently, the Court will analyze Plaintiffs' arguments only to the extent that they challenge specific implementations of ecosystem management as being inconsistent with the HNFP.

In this vein, Plaintiffs allege that implementation of ecosystem management will decrease elk hiding cover by reducing conifer colonization, contrary to the HNFP management directive to favor species that require seclusion. (Docs. 12 at 16–19; 30 at 22–23). The Forest Plan directs that:

> Wildlife habitat will be managed to maintain viable populations of species associated with existing ecosystems, with emphasis on selected species that have seclusion as one of their habitat requirements.

-24-

AR 25840. Defendants respond that the Project was designed with species requiring seclusion "in mind" and that decreasing conifer colonization will "increase both forage and vegetative diversity for those species." (Doc. 23 at 52.) Plaintiffs do not dispute that the project activities will have these effects but, instead, argue that elk in the Elkhorns need hiding cover more than they need foraging habitat and, consequently, hiding cover should be more important than foraging habitat. (Doc. 12 at 18.) Plaintiffs allege that because there is "no evidence in the record that elk are starving from a lack of forage," the real reason the Project was approved is to improve livestock grazing habitat. (*Id.* at 18–19.) This argument is unconvincing.

The Forest Plan's management goals for the Elkhorns encourage habitat improvement projects such as the one at issue. The Project authorizes treatments within management areas Elkhorn-1, Elkhorn-2, and Elkhorn-3, a portion of which "overlaps with the Elkhorn Inventoried Roadless Area." (Doc. 24 at 6.) The management areas are each subject to their own management goals, resource potentials, and limitations, in addition to those imposed in the HNFP. (*Id.*) Within Elkhorn-1, the Forest Service is to implement wildlife habitat improvement practices, "particularly prescribed fire, to maintain and enhance the quality of elk winter range." AR 24630. Within Elkhorn-2, the Forest Service is to "optimize . . . summer elk habitat," maintain "or enhance moose and mule deer

-25-

summer and fall habitat," and "maintain or enhance nongame wildlife species." AR 24633. And, in Elkhorn-3, the Forest Service is to implement wildlife habitat improvement practices, "including prescribed fire and timber management, to maintain and enhance the quality of elk calving and summer habitat," and maintain "or enhance moose, mule deer, and other wildlife habitat." AR 24635.

The Project is consistent with these directives, as it authorizes treatment activities, including prescribed fire, to improve habitat for elk, mule deer, and moose by increasing their forage habitat while retaining screening along roadways and leaving access to highly secluded areas unchanged. AR 4571; AR 4580; AR 4617; AR 22563. Plaintiffs do not dispute these benefits of the Project or contend that the Forest Service did not consider hiding cover but contend that increasing hiding cover should have been more important. However, the Forest Service's decision "need be only a reasonable, not the best or most reasonable, decision." *National Wildlife Federation v. Burford*, 871 F.2d 849, 856 (9th Cir. 1989). The Court is satisfied that Forest Service's decision is reasonable, made after a consideration of the relevant factors, and, further, is not clearly erroneous as regards the directive to favor species requiring seclusion. NFMA has not been violated—the Project will benefit species requiring seclusion, just not in the way Plaintiffs think best.

-26-

### ii. Elk hiding cover

Plaintiffs next contend that the Forest Service has not "demonstrated compliance with the 35% hiding cover standard, measured by Elk Herd Unit ("EHU"), required by the Forest Plan." (Doc. 12 at 20 (citing AR 25743).) Accordingly, Plaintiffs assert that a project which aims to decrease colonizing conifers will decrease hiding cover in areas already deficient pursuant to the HNFP and, as a consequence, violate NFMA. Plaintiffs claim that Defendants calculations showing sufficient hiding cover "lack . . . [a] common denominator" and are particularly suspect in light of historically insufficient levels of hiding cover in the Elkhorns. (*Id.* at 20–21.) Plaintiffs point out that the Forest Service is obligated to provide a "'rational connection between the facts found and conclusions made'" which it has failed to do when showing that current hiding cover calculations show compliance with the HNFP. (Doc. 30 at 18–19 (quoting *Native Ecosystems Council*, 418 F.3d at 963–64).)

Defendants respond that the hiding cover reports relied upon by Plaintiffs are outdated and have been replaced by more recent "documented" calculations performed pursuant to the direction of the HNFP which show that hiding cover is at adequate levels. (Doc. 34 at 7.) Defendants argue that Plaintiffs have not taken into account "increases in total acreage in the [EHU] by the time of the Johnny Crow hiding cover calculations." (*Id.* at 6–7.) Defendants claim that the increase

questioned by Plaintiffs is "unsurprising where understory growth occurs or the overall acreage within a herd unit expands." (*Id.* at 7.) Additionally, Defendants assert that their hiding cover calculations used "R1-VMAP" and "2011 satellite imagery" to analyze three vegetative types which show that hiding cover in "two of the three elk herd units surpassed" HNFP requirements. Consequently, project treatments are only authorized to occur in those units where adequate cover can be maintained. (*Id.* at 8–9.)

As Plaintiffs point out, this is not the first time that elk hiding cover calculations have been called into question in the Elkhorns. In *Native Ecosystems Council v. United States Forest Service*, 418 F.3d 953 (9th Cir. 2005), the Ninth Circuit found the Forest Service in violation of NFMA because the Forest Service had not provided adequate explanation for the Court to determine whether the elk hiding cover standard in the HNFP was met. This was especially concerning in light of the "inherently low cover and . . . high degree of access" which had made the HNFP standard "difficult" to meet in the past. *Id.* at 963–64. While the Ninth Circuit could not find that hiding cover was insufficient in the EHU at issue, it could determine that the Forest Service had failed to include portions of the EHU that were on private lands in the calculus. *Id.* at 963. Because the Ninth Circuit could not "reasonably . . . ascertain from the record that the Forest Service is in compliance with the [HNFP] standard," but could readily see that relevant

-28-

components were left out of the calculus, the Ninth Circuit held that the Forest

Service had violated NFMA. *Id.* at 963–64. However, that is not the case here,

where the Court is provided with adequate information to determine that the Forest

Service complied with the HNFP hiding cover calculation.

The HNFP mandates:

An environmental analysis for project work will include a cover
analysis. The cover analysis should be done on a drainage or elk herd
unit basis. . . . Subject to hydrologic and other resource constraints,
elk summer range will be maintained at 35 percent or greater hiding
cover and areas of winter range will be maintained at 25 percent or
greater thermal cover in drainages or elk herd units.

AR 25743. In this case, hiding cover "is based on the [Montana Fish Wildlife and

Parks ("MFWP")] definition of 'a stand of coniferous trees having a crown closure

of greater than 40 percent.'" AR 4552. When using this definition, hiding cover

must remain above 50 percent per EHU. AR 25744. This apparently accounts for

the general assumption that the MFWP "crown closure" definition will satisfy the

"functional definition of hiding cover" provided by the Forest Service which

defines hiding cover as "vertical structure that would hide 90% of an elk at 200

feet." AR 4552.

As Defendants have noted, the data relied upon by Plaintiffs is outdated.

Although the 2009 report (completed in 2012) showing that the North Crow and

South Crow EHUs did not have 35% hiding cover used the same 2011 map, the

-29-

map is not the only information relied upon in the calculation. AR 4552; AR 53503. The 2009 report notes that the Forest Service is "in the process of re-measuring our intensified grid point in order to identify changes in vegetation based on the mountain pine beetle outbreak" and that older information would be used in the 2009 report "for continuity." AR 53503. Defendants assert that the Forest Service did receive updated information regarding vegetation which was used when the EHU hiding cover calculation were performed in February 2017 for the Johnny Crow Project. (Doc. 34 at 6–7.)

Additionally, Defendants note that "the overall acreage within a herd unit expands" and, indeed, did expand by the time of their most recent EHU hiding cover calculation. (*Id.* at 7.) The record supports this statement. The 2009 report indicates that the North Crow EHU is 25,828 acres with 3,936 acres of hiding cover (15%), the South Crow EHU is 32,586 acres with 7,238 acres of hiding cover (22%), and the Devil's Fence EHU is 20,245 acres with 258 acres of hiding cover (1%). AR 53504. In contrast, the 2017 report shows that the North Crow EHU is 42,724 acres with 21,777 acres of hiding cover (51%), the South Crow EHU is 35,590 acres with 19,574 acres of hiding cover (60%), and the Devil's Fence EHU is 20,245 acres with 7,093 acres of hiding cover (35%). AR 4592.

Plaintiffs claim that these increases are suspicious but do not present evidence showing that the acreage has been miscalculated or that the calculations

are inaccurate. Plaintiffs merely assert that these are significant increases in an area with a pine beetle epidemic and a history of sparse hiding cover. However, the Forest Service has provided the Court with a description of the methodology used (AR 4552), which takes into account "the most up to date data available" (AR 4546), reflects more vegetative types (AR 4546), and shows compliance with the HNFP hiding cover definition (AR 4552; AR 4592). Defendants explain that the increase in the denominator is due to "increases in total acreage" of the EHUs while the increase in the numerator is a result of "understory growth." (Doc. 34 at 7.) The Court can reasonably ascertain from the record that the Forest Service complied with the HNFP definition of hiding cover when determining that the North Crow EHU and South Crow EHU meet HNFP hiding cover standards.[3]

In light of the above, the Court is satisfied that the Johnny Crow Project's EHU hiding cover analysis does not violate NFMA.

### iii. Annual progress reports

Lastly, Plaintiffs claim that the Forest Service has failed to issue annual project reports required by the HNFP, resulting in a NFMA violation. Plaintiffs assert that the required reports help inform decision-makers and involve the

---

[3] While the Fence Creek EHU does not meet HNFP hiding cover standards, the Project will not reduce hiding cover in this EHU. AR 4502. Additionally, project treatments in the North Crow EHU and South Crow EHU will not reduce hiding cover in those units below HNFP standards. AR 4502.

-31-

general public in the planning process.[4]  (Doc. 30 at 6–7.)  Without these reports,

Plaintiffs assert that "aggressive habitat manipulations in WMU" are "necessarily

call[ed] into question."  (*Id.* at 7.)  Plaintiffs assert that these reports are required to

apprise decision-makers and the public of the effects of ecosystem management.

(*Id.* at 14.)

Working from the top down, Plaintiffs assert that the following standards

have been breached by the Forest Service.  First, the HNFP imposes the following

forest-wide standard:

> Population of wildlife "indicator species" will be *monitored to measure the effect of management activities on representative wildlife habitats* with the objective of ensuring that viable populations of existing native and desirable non-native plant and animal species are maintained.

AR 25743 (emphasis added).  Specific to the entire Elkhorn WMU, the HNFP

establishes the following objectives:

> (1) evaluate management direction provided in Forest Plans; (2) provide recommendations to maintain and improve wildlife habitat; and (3) *continue to monitor habitat conditions and wildlife populations to determine the effectiveness and applicability of existing and prescribed management.*

---

[4] To the extent that Plaintiffs' response brief can be interpreted as raising an issue regarding a lack of public participation or information in violation of NFMA, that argument is impermissibly presented for the first time in their consolidated response/reply brief.  *Zamani v. Carnes*, 491 F.3d 990, 997 (9th Cir. 2007) ("The district court need not consider arguments raised for the first time in a reply brief.").  Consequently, the Court will not consider it.

AR 25841 (emphasis added). Additionally, specific to management areas Elkhorn-1, Elkhorn-2, and Elkhorn-3, the HNFP requires that:

> *Suggested habitat improvement projects will be discussed in the Elkhorn Wildlife Monitoring Program annual progress reports* prepared jointly by the Helena and Deerlodge National Forests and [MFWP]."

AR 25843–52 (emphasis added).

Defendants counter that they have complied with these requirements. First, Defendants state that they have consistently monitored habitat conditions and wildlife populations to comply with the forest-wide standard of the HNFP and the Elkhorns WMU specific objectives. (Doc. 34 at 10.) Second, Defendants contend that they have complied with the annual reporting requirement. Specific to the Johnny Crow Project, Defendants direct the Court to the "Program of Work" report for 2017. AR 4738. Additionally, Defendants assert that the language in the cited standards does not obligate the Forest Service to tailor land management activities to suggestions contained in the reports or provide "any particular instructions governing the design or development of a project." (Doc. 23 at 48.) The Court agrees that Defendants have satisfied their requirements.

The record demonstrates that Defendants have been monitoring wildlife and, more importantly, gathered that monitoring information for analysis relative to the shaping and approval of the Johnny Crow Project. In relation to the HNFP forest-

wide requirement that the Forest Service monitor populations of "indicator species," the record displays that this monitoring is being performed and was considered in relation to the Project. *See, e.g.*, AR 4563–72 (discussing monitoring results of marten and goshawks and anticipated results of treatment activities authorized by the Project); AR 4647–4649 (discussing populations of pileated and hairy woodpeckers and project effects on same); AR 23399–403 (investigation on fire effects on marten habitat); AR 30309–14 (study of fire effects on goshawk habitat); AR 53534–46 (Helena National Forest 2009 Forest Plan Monitoring Report showing data and documentation used to monitor goshawk and marten habitats to "measure the effect of management activities on representative wildlife habitats with the objective of ensuring that viable populations of existing native . . . species are maintained"). The nearly 54,000-page record is rife with monitoring results, analyses, and recommendations. This same sample of record evidence shows that the Forest Service is complying with the Elkhorn WMU objective to monitor wildlife populations to determine effectiveness of treatment activity. The Court is satisfied that Defendants have complied with the HNFP requirement and the Elkhorn WMU specific objective to monitor species to determine the effectiveness of management activity.

The record also demonstrates that suggested habitat improvement projects are being discussed in annual progress reports as required by the Elkhorns WMU's

-34-

management area specific requirements. As Defendants' point out, the requirement is simply that suggested habitat improvement projects are discussed in annual progress reports prepared jointly by the Forest Service and the MFWP. This broad requirement does not provide any particular instructions governing the design or development of a project. (Doc. 23 at 48.) Relevant to the Project, the "Final Elkhorn Program of Work for Fiscal Year 2017" report prepared jointly by the Forest Service and the MFWP discusses plans relating to the Johnny Crow Project. AR 4738–55. Additionally, the treatment activities authorized by the Project are discussed in the annual reports going back to 2011. *See* AR 3778–81 (2011 report recommending prescribed burns and slashing in "Crow Creek units" to reduce conifer encroachment and discussing multi-year collaborative vegetation management project); AR 3884–88 (2012 report including same); AR 3938–42 (2013 report including same); AR 4004–08 (2014 report including same); AR 4076–80 (2015 report including same). Although there is not an identical report provided in the record for 2016, the Court is convinced that this history of reporting and discussion of activities proposed in the Johnny Crow Project demonstrates that the Forest Service has complied with its requirements. Further, Plaintiffs' broad allegation of a general failure to comply with this reporting requirement does not provide the Court with a specific connection between the missing 2016 report and the Project, as required by the APA. *Ecology Center v.*

-35-

*Castaneda*, 574 F.3d 652, 658 (9th Cir. 2009) ("The Plaintiff must allege a 'specific connection' between the challenged site-specific action and the general practice."). The Court is convinced that the Forest Service has been discussing proposed project activities in annual reports.

Lastly, Plaintiffs' argument that the Forest Service was required to discuss the impacts of ecosystem management itself within these reports is untenable. As this Court defined that term:

> Ecosystem management means using an ecological approach to achieve the multiple-use management of national forests and grasslands by blending the needs of people and environmental values in such a way that national forests and grasslands represent diverse, healthy, productive, and sustainable ecosystems.

*American Wildlands*, 1999 U.S. Dist. LEXIS 22243, at \*5. By this definition, it is apparent that ecosystem management is a conceptual approach that will only have visible effects when applied through specific projects—such as those proposed by the Johnny Crow Project—or through particular policies—such as in the Forest Plan Amendment at issue in *American Wildlands*. Plaintiffs' argument on this point is a perpetuation of their argument dispatched above. Namely, that the Court's decision in *American Wildlands* requires the Forest Service to complete an EIS before implementing ecosystem management in the Elkhorns. Again, the Forest Service will not trigger that obligation merely by implementing facets of ecosystem management in site-specific projects. Such an obligation will be

-36-

triggered by a significant redirection in the management of the Elkhorns, which is not the case here. Consequently, although the Forest Service is implementing facets of ecosystem management, it is only obligated to monitor the effectiveness of "existing and prescribed management." AR 25841. Which, in this case, includes such treatment as the prescribed burning of encroaching conifers, which the Forest Service has monitored and analyzed. *See, e.g.*, AR 21526–27 (1994 authorization to burn 2,457 acres of conifer habitats in Crow Creek area); AR 21676–77 (review of burn efficacy and effects in Crow Creek area); AR 183–241 (2014 Crow Creek wildlife habitat analysis discussing fire impacts).

The Court is satisfied that the Forest Service has complied with its obligations and that Plaintiffs' claims regarding progress reporting do not amount to a violation of the NFMA. Summary judgment in favor of Defendants and against Plaintiffs will be granted on Plaintiffs' NFMA claims.

## B. Plaintiffs' NEPA Claims

The Forest Service's compliance with NEPA in this case was limited to its decision to apply the categorical exclusion found at 36 C.F.R. § 220.6(e)(6) to the treatment activities authorized by the Johnny Crow Project. In order to do this, the Forest Service needed to determine: 1) that the project activities fell within the excluded activities enumerated at § 220.6(e)(6), and 2) that there are no extraordinary circumstances related to the project activities which could have a

-37-

significant environmental effect such that an EA or EIS would nonetheless be necessary. 36 C.F.R. § 220.6(a). This Court is limited to determining whether the Forest Service's decision to apply a categorical exclusion in this case was arbitrary or capricious. *Bicycle Trails Council of Marin*, 82 F.3d at 1456. To do this, the Court considers whether the Forest Service's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. *Id.*

Plaintiffs do not dispute that the treatment activities proposed in the Johnny Crow Project fall within the category of activities excluded under § 220.6(e)(6), and the Court finds that Project activities fall squarely within that enumerated category. Instead, Plaintiffs contend that the Forest Service has failed to consider the cumulative effect of those actions which Plaintiffs contend would render the categorical exclusion inapplicable. (Doc. 12 at 23.) Additionally, Plaintiffs claim that the Forest Service failed to consider the proper factors when deciding that no extraordinary circumstances precluded the use of the categorical exclusion in relation to project activities planned for the Inventoried Roadless Area. (*Id.* at 26–29.)

For the following reasons, Plaintiffs have failed to show that the Forest Service's decision to categorically exclude proposed treatment activities violated NEPA. Because the Forest Service's analysis of extraordinary circumstances in

-38-

this case included the necessary consideration of cumulative effects, the Court will address Plaintiffs' arguments in reverse order.

### i. Extraordinary circumstances

There are certain resource conditions that the Forest Service is obligated to consider when determining whether extraordinary circumstances related to project activities will warrant analysis in an EA or EIS. 36 C.F.R. § 220.6(b)(1). As disputed in this action, this includes an inventoried roadless area or potential wilderness area. § 220.6(b)(1)(iv). However, the mere presence of one of these resource conditions "does not preclude use of a categorical exclusion," there must be a "cause-effect relationship between a proposed action and the potential effect on these resource conditions." § 220.6(b)(2) Only then must the agency "analyze the degree of the potential effect to determine whether extraordinary circumstances exist." *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, 1124 (D. Mont. 2013). While the Forest Service "must supply a convincing statement of reasons why potential effects are insignificant," once it has considered "the proper factors and [made] a factual determination on whether the impacts are significant or not, that decision implicates substantial agency expertise and is entitled to deference." *Alaska Center for Environment*, 189 F.3d at 859.

Plaintiffs first claim that the Forest Service neglected to consider the effects of the Project "on the entire roadless expanse—that is both the roadless area and

the unroaded lands contiguous to the roadless area." (Docs. 12 at 28; 30 at 24–25.) Second, Plaintiffs claim that the "nine or more square miles of clearcuts" prescribed by the Project "has the potential for prejudicing" the designation of the Inventoried Roadless Area ("IRA") as wilderness, which was not considered by Defendants. (Docs. 12 at 28; 30 at 26–27.) Plaintiffs assert that because the Project proposes to treat "a significant portion of the Elkhorn roadless area," the Forest Service "must disclose 'at the very least, the fact that development will affect' the roadless area." (Doc. 30 at 27 (quoting *Lands Council v. Martin*, 529 F.3d 1219, 1232 (9th Cir. 2008)).)

In response to Plaintiffs' first argument, Defendants assert that the record demonstrates that they did consider the effects of proposed activities on the relevant resource conditions, which included "the 'inventoried roadless boundary and its associated unroaded expanse.'" (Doc. 34 at 14 (quoting AR 1067).) The record again supports Defendants' position.

Plaintiffs point to the Johnny Crow Project Area map as establishing that the Forest Service only analyzed project impacts within the project area and not outside of that boundary. (Doc. 30 at 26 (citing AR 22558).) However, this contention is belied by the record, which shows that the Forest Service was aware of its obligation to analyze effects across the IRA and "the entire roadless expanse," and went on to analyze just that. AR 1065. Further, the map relied upon

by Plaintiffs is simply a map of the Johnny Crow Project boundary and treatment areas, it does not differentiate between analyzed and unanalyzed areas. The Forest Service analyzed the effects of the Project on the IRA and "its unroaded expanse" in detail. AR 1047–56. In fact, the Forest Service found that proposed treatments would have some negative effects on this area. For example:

> Project proposal would not affect the undeveloped character of the inventoried roadless area nor its roadless expanse in the long-term. However, human activity would be evident for a number of years due to the hand slashing of conifer trees less than 12" diameter-at-breast-height.

AR 1048. In its analysis, the Forest Service considered the degree that the potential effects would impact the resource conditions to determine if extraordinary circumstances existed. The Forest Service determined that the Project's treatments would either improve conditions or produce negligible "short-term" effects. AR 1047–56. Consequently, the Forest Service determined that the potential negative effects did not amount to extraordinary circumstances precluding the use of the categorical exclusion. AR 1047–56; 1065–67. The Court is convinced that the Forest Service considered the relevant factors in making this determination, including the impacts on the entire roadless expanse, and finds no error in the analysis.

As to Plaintiffs' second argument, regarding the IRA's wilderness designation potential, Defendants claim that Plaintiffs have mischaracterized the

-41-

treatments as occurring over "nine contiguous square miles" when treatments will be "scattered and spread throughout the project area and would have a small footprint." Additionally, Defendants rely upon the same analysis referenced above to show that they have considered the wilderness characteristics which would effect the IRA's potential for wilderness designation. (Doc. 23 at 26–27.)

Hand slashing is not anticipated to create nine square miles of "clearcuts." Instead, it will take place over "a relatively small area," and will "target only certain trees and certain areas" which will "help to restore some of the natural quality of these previously altered areas within the inventoried roadless area and its unroaded expanse." AR 1069. The "nine square miles" of treatments will be spread across different landscapes within the IRA including grasslands, shrublands, riparian, wetland and aspen habitats, and five-needle pine habitats. AR 22565–66. Additionally, of the 6,046 acres to be treated within the IRA, 3,000 acres (those targeted to promote forest stand age class and species diversity) will not be subject to the hand slashing that Plaintiffs claim will create "clearcuts" but is slated to receive only "[m]ixed severity prescribed fire." AR 22565–66.

Roadless areas are significant "because of their potential for designation as wilderness areas under the Wilderness Act of 1964, 16 U.S.C. §§ 1131–1136." *Lands Council*, 529 F.3d at 1230. Looking at the same analysis of anticipated treatments on the IRA and the "entire roadless expanse" relied on above, the Court

-42-

is convinced that the Forest Service has considered the effects the Project will have on the IRA's attributes which give it potential for wilderness designation. The Forest Service laid out the wilderness attributes that may possess independent environmental significance in that they could make an area "suitable for wilderness recommendation" and compared them to those found in a roadless area. AR 1067–68. Moreover, the Forest Service discussed the impact that prescribed burning and hand slashing would have on these attributes, such as the IRA's natural undeveloped characteristics, its opportunities for solitude and primitive recreation, its special features that might have some cultural significance, and its manageability as wilderness. AR 1047–56; AR 1067–71. The Forest Service determined that project activities would not have an effect on these attributes. The Court finds that the Forest Service adequately considered the IRA's wilderness designation potential in making its decision and can find no clear error in its determination.

Pointing to *Smith v. United States Forest Service*, 33 F.3d 1072 (9th Cir. 1994), and *Lands Council v. Martin*, 529 F.3d 1219 (9th Cir. 2008), Plaintiffs claim the fact that the Project will treat approximately 6,046 acres of roadless area triggers an obligation on the part of the Forest Service to disclose the "fact that development will affect the roadless area." (Doc. 30 at 27.) However, as this Court has already determined, the Forest Service has disclosed and analyzed the

-43-

anticipated effects the Project will have on the potential wilderness designation of the IRA. It is unclear what else Plaintiffs would require of the Forest Service. Plaintiffs appear to contend that whenever a project will treat more than 5,000 acres of land within a roadless area, it must disclose that development will affect an area's wilderness designation potential. (Doc. 30 at 25–27.) However, *Smith* and *Lands Council* were dealing with projects authorizing logging in roadless areas and stand for the proposition that "when an agency is considering logging in roadless areas, the logging is 'environmentally significant' and 'its environmental consequences must be considered.'" *Alliance for the Wild Rockies v. Krueger*, 950 F. Supp. 2d 1196, 1214 (D. Mont. 2013) (quoting *Lands Council*, 529 F.3d at 1230). Consequently, in those cases, the Forest Service was required to disclose that project activities were going to occur in an area large enough to be a candidate for wilderness designation. *Lands Council*, 529 F.3d at 1230–31 (citing *Smith*, 33 F.3d at 1078–79).

Here, we do not have a project authorizing logging in a roadless area. Additionally, we have an administrative record that discusses project impacts on the attributes which qualify roadless areas for wilderness designation and analyzes why project activities will not affect those attributes. AR 1047–56; AR 1064–71. Potential impacts have been disclosed, analyzed, and found to be immaterial. The Court is satisfied that *Smith* and *Lands Council* require nothing further.

-44-

In sum, after reviewing the Forest Service's analysis, the Court finds that the Forest Service considered the relevant factors and can ascribe no error to the Forest Service's determination that there are no extraordinary circumstances which preclude the categorical exemption of project activities in the IRA and its "entire unroaded expanse."

## ii. Cumulative effects

Cumulative impacts are those impacts on the environment which result from the incremental impact of the proposed action when added to other past, present, and reasonably foreseeable future actions. 40 C.F.R. § 1508.7. When an action "is related to other actions with individually insignificant but cumulatively significant impacts," significance exists if "it is reasonable to anticipate a cumulatively significant impact on the environment." 40 C.F.R. § 1508.27(b)(7).

Plaintiffs fault the Forest Service for failing to sufficiently analyze the cumulative effects of project activities with the effects of past treatment activities from as far back as 1990. (Doc. 12 at 25.) Plaintiffs assert that the Forest Service must "demonstrate either that this project is somehow unrelated" to those past projects or that it "is certain not to have any significant adverse impacts to wildlife." (*Id.*) Additionally, Plaintiffs argue that there "has never been an EIS that has considered the cumulative effects of continued livestock use together with slashing and burning conifer and shrubland habitat types" on the IRA and

contiguous unroaded areas. (Docs. 12 at 26–27; 30 at 24.) Plaintiffs assert that the

cumulative effects analysis provided in the administrative record "is one paragraph

long and contains conclusory statements of the lack of impact on the Roadless

Area." (Doc. 30 at 29 (citing AR 1071).) Relying on *Neighbors of Cuddy*

*Mountain v. United States Forest Service*, 137 F.3d 1372, 1379–80 (9th Cir. 1998),

Plaintiffs claim that this analysis is insufficient to satisfy the Forest Service's

obligation to "consider" cumulative effects. (*Id.*)

However, the Ninth Circuit in *Neighbors of Cuddy Mountain* was not

discussing the Forest Service's NEPA obligations when a categorical exclusion has

been applied, and Plaintiffs' arguments on this point ignores this Court's prior

decision in *Alliance for the Wild Rockies v. Weber*, 979 F. Supp. 2d 1118, (D.

Mont. 2013). In *Weber*, this Court agreed with the Forest Service that the

extraordinary circumstances analysis employed by the Forest Service when

applying a categorical exclusion "includes consideration of whether a normally

excluded action may have cumulatively significant environmental effect." *Id.* at

1129 (citing 40 C.F.R. §1508.4). The term "significant" as used in NEPA

"mandates a multitude of considerations, including the potential for uncertain

effects, which is also a consideration under the extraordinary circumstances

analysis." *Id.*

Again, categorical exclusions apply to categories "of actions which do not individually or cumulatively have a significant effect on the human environment." 40 C.F.R. § 1508.4. Prior to establishing a categorical exclusion, the agency must perform a scoping process to identify the significant issues related to the proposed action and judge the scope of those issues. During this process, the Forest Service must consider the cumulative impacts of connected, cumulative, and similar actions, and must prepare an EA if the project may have significant effects on the environment. *Weber*, 979 F. Supp. 2d at 1125 (citing *Sierra Club v. Bosworth*, 510 F.3d 1016, 1026 (9th Cir. 2007)). By definition then, if proposed actions are among the types of actions categorically excluded and the Forest Service has determined that no extraordinary circumstances exist, then the action is one which does not "individually or cumulative have a significant effect on the human environment." Consequently, if the Forest Service has satisfied its obligation to consider extraordinary circumstances, then no further cumulative effects analysis is needed.

Here, the Forest Service aggregated the past impact of activities into an "environmental baseline" from which the Forest Service examined the impact of proposed activities. *See, e.g.*, AR 4655–4662; AR 10791–94. This aggregated baseline approach is permissible under Ninth Circuit law. *See Cascadia Wildlands v. Bureau of Indian Affairs*, 801 F.3d 1105, 1111 (9th Cir. 2015) ("An agency . . .

may satisfy NEPA by aggregating the cumulative effects of past projects into an environmental baseline, against which the incremental impact of a proposed project is measured.") (citing *Ecology Center v. Castaneda*, 574 F.3d 652, 666–67 (9th Cir. 2009)). From here, Forest Service specialists in a multitude of fields considered the cumulative effects of project activities when determining whether extraordinary circumstances existed. *See, e.g.*, AR 1057–1071 (specialist's analysis on project activities effects on IRA and unroaded expanse). This is sufficient.

Plaintiffs have not argued that project activities are not of the type categorically excluded by § 220.6(e)(6). And, for the reasons discussed above, the Court is satisfied that the Forest Service considered the relevant factors when determining that no extraordinary circumstances exist that would make the categorical exclusion of the proposed activities inapplicable. Accordingly, just as in *Weber*, "[b]ecause a cumulative effects analysis was performed as part of the categorical exclusion decision for this Project, a separate cumulative impacts analysis is not required." *Weber*, 979 F. Supp. 2d at 1129. Again, the Forest Service considered the relevant factors and reached a reasonable decision, the Plaintiffs have not established a NEPA violation.

### iii.    Other arguments

Before concluding, the Court finds it necessary to summarily address arguments tangentially raised by Plaintiffs. First, Plaintiffs contend the Johnny Crow Project was "illegally" tiered to a 1993 Elkhorns Landscape Analysis presumably to elude further NEPA analysis. (Docs 12 at 4–5, 24; 30 at 21–22.) Plaintiffs do not support this bald assertion with any reference to the record showing the Forest Service's reliance on the Landscape Analysis. Mere consistency between some of the desired conditions contained in the Landscape Analysis and the conditions which the Project intends to implement is not sufficient to establish that the Project's analysis was tiered to the Landscape Analysis. Tiering involves the coverage of "general matters in broader environmental impact statements," with subsequent environmental analysis "incorporating by reference [those] general discussions." 40 C.F.R. § 1508.28. As has been thoroughly discussed, the Project complies with NEPA through a categorical exclusion. The use of the categorical exclusion did not rely on the Landscape Analysis in any way to satisfy NEPA. This argument lacks merit.

Second, Plaintiffs consolidated response/reply brief concludes with a lengthy discussion of why the treatment of ecotones can be detrimental to some species of wildlife. (Doc. 30 at 30–34.) Again, the APA gives "an agency substantial discretion 'to rely on the reasonable opinions of its own qualified experts even if,

as an original matter, a court might find contrary views more persuasive.'" *San Luis & Delta-Mendota Water Authority*, 776 F.3d at 992 (quoting *Marsh*, 490 U.S. at 378). Here, not only is Plaintiffs' discussion an overly broad complaint about the general management direction of the Elkhorns that is untethered to specific project activities, it is a dispute with the opinions of qualified experts relied upon by the Forest Service. The Court abstains from any further discussion of the scientific merit of ecosystem management. Plaintiffs have failed to show that the Forest Service's application of a categorical exclusion in this case was either arbitrary or capricious. The Court has consistently found that the Forest Serivce's decision was based on a consideration of the relevant factors and does not reflect a clear error of judgment. Accordingly, no NEPA violation exists.

## ORDER

Based on the foregoing, IT IS ORDERED that Defendants' Motion for Summary Judgment (Doc. 22) is GRANTED and Plaintiffs' Motion for Summary Judgment (Doc. 10) is DENIED as to all claims.

IT IS FURTHER ORDERED that Defendants' Motion to Strike (Doc. 17) is DENIED.

IT IS FURTHER ORDERED that Plaintiffs' Motion to Supplement the Administrative Record (Doc. 13) and Motion for Leave to File Amended Complaint (Doc. 19) are GRANTED.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter

judgment in favor of Defendants and against Plaintiffs and to close the case.

DATED this 10th day of December, 2018.

Dana L. Christensen, Chief Judge
United States District Court